CARAWAY, J.
|,In this unique setting, a mother came to the aid of her daughter and helped her build a home during the procedural ordeal of the daughter’s divorce. The house was built, and title to the home was placed in the name of the mother. Two fire insurance policies were purchased from defendant, one by each woman to protect her interest in the home. After the daughter had lived in the new home for only a few months, the home was totally destroyed by fire. The mother and daughter then brought this suit alleging that defendant had not properly paid both of them under the terms of their respective policies. The defendant moved for summary judgment asserting that plaintiffs were properly paid benefits in accordance with their separate insurable interests and the terms of the policies. The trial court granted summary judgment, and we now affirm.

Facts

Patricia Barham (“Barham”) was attempting to build and purchase a home in April 2011. At the time, she was going through a contentious divorce. The divorce contest prevented her from building a home with former community funds during the proceedings, so Barham obtained the help of her mother, Claire Lutey (“Lu-tey”). Barham then supplied $10,000 in earnest money on April 28, 2011, to pay for the construction of a home. Lutey agreed to pay for the rest of the construction of the home using cash from her brokerage account. The residence was purchased in Lutey’s name. The total purchase price was $330,919. Barham informally agreed to make monthly payments of $1,200 to Lutey to reimburse her for paying to build |2the house. Barham considered herself as the person purchasing the home. Nevertheless, the mother and daughter also considered Barham’s payments to Lutey as rent. The $1,200 monthly payment was chosen as the typical monthly rent on a house of the same type. Barham also made several improvements to the residence with her own funds.
Shortly after moving into the home, on June 29, 2011, Barham took out a homeowner’s policy with USAA Casualty Insurance Company (“USAA”) for $242,000 and an additional $181,500 for personal property. Barham also obtained a renter’s policy to cover her personal possessions in the house for $75,000. Additionally, Lutey obtained a “fire policy” with USAA covering the home to $242,000. Lutey and Barham each had separately contacted USAA by phone on different occasions and taken out the policies.
The $242,000 policy limits on the home were calculated using basic information of the home’s characteristics. Each policy had its own premium. Barham paid the initial premiums on all the policies. The annual premium on Barham’s homeowner policy was $584.74. The annual premium on the Lutey fire policy was $583.44. The annual premium for Barham’s renters policy was $86.14.
On November 8, 2011, lightning struck the house, and it was destroyed by fire. As a result of the loss, USAA paid Lutey $249,873.57. She was paid the $242,000 face value of the policy. She was also paid $7,200 for the loss of rental income for six months. At the time of the fire, |aBarham had paid Lutey $1,200 in rent for six months. Finally, Lutey was paid $673.57 for damage to “other structures.”
USAA did not pay the face value of $242,000 for Barham’s homeowner’s policy. Rather, Barham was paid $69,144.89 for contents lost in the fire. She was paid $10,000 for the earnest money and $4,928.99 for landscaping and other im *1169 provements made on the home with her funds. The total amount USAA paid on the policies was over $333,00.0. The house was subsequently rebuilt, and the cost to rebuild was $243,083.87.
Barham and Lutey filed suit against USAA claiming that it did not pay the full amount of Barham’s policy, $242,000 plus another 25%, or $60,500, under the “Home Protector Coverage” portion of Barham’s homeowner policy, or $302,500 total. Bar-ham and Lutey also alleged in their petition that USAA failed to refund premiums. Barham also seeks expenses and attorney fees for USAA’s arbitrary refusal to pay.
USAA did not pay the full amount on Barham’s policy because it determined that Barham’s insurable interest in the property was not the full amount of the homeowner policy limit. Each insurance policy issued contains a clause in the “Conditions” section of the polices that in no event will USAA pay the insured on any loss that is greater than the amount of the insured’s interest in the residence. The clauses state:
Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:
a) To the “insured” for more than the amount of the “insured’s” interest at the time of loss; or
b) For more than the applicable amount of insurance, whichever is less.
|4USAA contended that Barham’s insurable interest is limited to the $10,000 earnest payment she made along with $4,928.99 she paid in improvements to the home. USAA determined Barham’s insurable interest based on a telephone interview between Duane Quinn, a USAA claims adjuster, and Barham, as well as an interview with the same adjuster and Lu-tey.
USAA filed a motion for summary judgment contending that it paid the full amount that was owed to each party. In support of its motion for summary judgment, USAA submitted all of the insurance policies. Additionally, USAA submitted two transcripts of telephone interviews, one between a claims adjuster and Barham and another between the same adjuster and Lutey, each with Barham and Lutey’s attorney present. Further, USAA submitted the affidavit of Duane Quinn, the claims adjuster for the loss who had conducted the interviews with Barham and Lutey. USAA also included the letters sent to the appellants informing them of the payments that would be made on the policies.
In opposition to the motion for summary judgment, Barham and Lutey submitted the affidavit of Barham stating that Lutey was merely acting as her bank in purchasing the house. Barham and Lutey also submitted an affidavit of Harvey Hales, a local insurance agent. He explained that USAA should have had an agent in the area rather than obtaining the insurance by phone. He also stated that the home was underinsured. He stated the first home policy should have been to the limit of $290,000. Finally, Barham and Lutey submitted the declarations page of | .¡Barham’s new homeowner policy with a policy limit of $303,000 with USAA covering the rebuilt house.
When asked what her financial interest in the residence was by the claims adjuster, Barham stated:
Well, I made a $10,000 down payment, and I paid for shutters and wooden blinds to the tune of $4,400. I planted a $100 Japanese maple tree. I probably spent $175 planting flowers. Uh, I’ve been paying for the yardman. I have paid for my mother’s homeowners insur- *1170 anee. I have paid her interest.[1] I have paid all of her costs and that’s all I can think of right now.
Both Barham and Lutey stated in their interviews that Lutey is the owner of the home.
The trial court granted USAA’s motion for summary judgment without written or oral reasons. From this judgment, Bar-ham and Lutey appeal asserting that the trial court erred by not providing reasons for judgment, by failing to address the claim that USAA failed to secure adequate coverage, and by failing to consider and discuss Barham’s and Hales’s affidavits.

Insurance Law

No contract of insurance on property or of any insurance therein or arising therefrom shall be enforceable except for the benefit of persons having an insurable interest in the things insured. La. R.S. 22:853(A). “Insurable interest” means any lawful and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage. La. R.S. 22:853(B). When the name of a |fiperson intended to be insured is specified in the policy, such insurance can be applied only to his own proper interest. La. R.S. 22:854(A). The great weight of authority recognizes that an interest in the property protected is essential to the existence of a valid insuring agreement and additionally serves to differentiate an enforceable indemnity agreement from a wagering pact, which is invalid and unenforceable for reasons obviously prompted-by public policy and good morals. Rube v. Pacific Ins. Co. -of N.Y., 131 So.2d 240 (La.App. 1st Cir.1961); Adam Miguez Funeral Home, Inc. v. First Nat. Life Ins. Co., 234 So.2d 496, 499 (La.App. 3d Cir.1970) (“Our jurisprudence is settled that the public policy purpose of requiring an insurable interest is to prevent wagering contracts on insurance risks.”); see also Hilltop Bowl, Inc. v. U.S. Fidelity & Guaranty Co., 259 F.Supp. 649, 652 (W-D.La.1966). An insurable interest must exist not only at the time the policy is written but also at the time ,of the loss. Giddens v. USAA Property and Cas. Ins. Co., 93-2067 (La.App. 1st Cir.10/7/94), 644 So.2d 827.
Louisiana’s Valued Policy Law, La. R.S. 22:1318 (originally 1900 La. Acts 135), provides that if the insurer places a valuation upon covered immovable property and charges a premium based on that valuation, in the case of total loss the insurer shall indemnify the loss at the policy valuation, unless the contract specifies a different method is to be used in the computation of loss. La. R.S. 22:1318(A).
The Louisiana Supreme Court has recently described the historical purpose of the Valued Policy Law as follows:
17Valued Policy Laws were enacted in many states in the late 1800’s [sic ] and early 1900’s [sic] “in response to the perception that insurers were profiting by selling insurance policies with inflated face values, and then, after the building suffered a total loss, litigating the actual value of the insured structure, even though the insured had been charged premiums for the policy limits _” John V. Garaffa, The Uncertain
Scope of “Hurricane Damage” Under State Valued Policy Laws, 41 Tort Trial & Ins. Prac. L.J. 943, 946 (2005-2006), citing Tom Baker, The Genealogy of Moral Hazard, 75 Tex. L.Rev. 237 (1996-1997). See also Atlas Lubricant Corp. v. Federal Ins. Co. of New Jersey, *1171 293 So.2d 550, 556 (La.App. 4th Cir. 1974) (“Valued policy laws ... dealing with [f]ire ins[urance] policies were enacted in the late 1800’s and early 1900’s principally as a protective measure for insureds.”). A secondary objective of Valued Policy Laws was to simplify the adjustment process following a total loss and to facilitate prompt settlement of insurance claims. Garaffa at 946-47.
Landry v. Louisiana Citizens Prop. Ins. Co., 07-1907 (La.5/21/08), 983 So.2d 66, 76-77. However, after a 1964 amendment, the Valued Policy Law provided that the liability of the insurer of a policy of fire insurance, in the event of total or partial loss, shall not exceed the insurable interest of the insured in the property unless otherwise provided for by law. La. R.S. 22:1318(C). An insurer may question or contest the insurable interest of the insured. Id. The intended purpose of the amendment was to limit the amount payable on a fire insurance policy to the extent of the insurable interest of the insured. See Miller v. Hartford Fire Ins. Co., 412 So.2d 662 (La.App. 2d Cir.1982).
Louisiana courts have held that an ownership interest is not necessary for an insured to have an insurable interest in the property. See Giddens, supra; Brewster v. Michigan Millers Mut. Ins. Co., 274 So.2d 213 (La.App. 2d Cir.1973); Young v. State Farm Fire & Cas. Ins. Co., 426 So.2d 636 (La.App. 1st Cir.1982); Stokes v. Republic Underwriters Ins. Co., 387 So.2d 1261 (La.App. 1st Cir.1980); see also Miller, supra; Nielsen vA^Lafayette Ins. Co., 300 So.2d 217 (La.App. 2d Cir.1974); Givens v. Southern Farm Bureau Cas. Ins. Co., 197 So.2d 380 (La.App. 2d Cir.1967) (mortgagee had insurable interest to the extent of unpaid balance on promissory note). For instance, in Brewster, supra, the court was determining whether the named, insured had an insurable interest in property that was destroyed in a fire. The insured purchased property and owned it for about fifteen years, residing there for most of that time. The insured also had previously leased out the property on a few occasions. The insured sold the property to his sons so that they could build retirement homes on the property. They agreed that the insured would be able to continue residing in the property and to rent it to others as he saw fit. The insured was to pay taxes on the property and pay the insurance premiums, and he made repairs at his own expense. The court found these facts sufficient to establish that the insured had an insurable interest, and thus the insurance contract was valid.

Discussion

USAA’s motion for summary judgment rests upon its separate contractual relationships with the two plaintiffs, their separate amounts received from USAA for the fire-related losses, and the ownership and other interests of each plaintiff that, according to USAA, establish undisputedly that the plaintiffs’ insurable interests were compensated by the policies’ indemnification protections. USAA contends that plaintiffs’ opposition to the motion for summary judgment did not demonstrate material fact disputes | regarding any further amounts owed under the policies for which the plaintiffs might prevail at trial.
When an appellate court reviews a district court judgment on a motion for summary judgment, it applies the de novo standard of review, using the same criteria that govern the trial court’s consideration of whether summary judgment is appropriate. Gray v. American Nat. Property & Cas. Co., 07-1670 (La.2/26/08), 977 So.2d 839 (citations omitted). After adequate discovery or after a case is set for trial, a motion for summary judgment which shows that there is no genuine issue as to *1172 material fact and that the mover is entitled to judgment as a matter of law shall be granted. La. C.C.P. art. 966(C)(1).
The burden of proof on a motion for summary judgment remains with the mov-ant. La. C.C.P. art. 966(C)(2). If the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant’s burden on the motion is to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim. Id. If the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. Id. An adverse party’s response must set forth specific facts showing that there is a genuine issue for trial. La. C.C.P. art. 967(B).
Barham and Lutey first contend that the trial court erred in failing to issue reasons for judgment. However, this contention is incorrect. Although “the court should provide reasons for the denial on the record” if a |inmotion for summary judgment is denied, the court is not required to do so. La. C.C.P. art. 966(B)(2) (emphasis added). Similarly, the trial court is not mandated to provide reasons for judgment when it grants the motion. However, La. C.C.P. art. 1917 provides that “[i]n all appealable contested cases, ... the court when requested to do so by a party shall give in writing its findings of fact and reasons for judgment.” (Emphasis added). Nothing in the record shows that such a request was made, and absent such a request, the trial court did not err.
In this unique setting, a fire and casualty policy was separately issued to each of the plaintiffs for coverage on the same home. In asserting a refund for premiums, the plaintiffs imply that a single policy would have been sufficient for their protection. Barham admitted paying premiums on her mother’s policy, but never questioned the necessity for dual coverage. Both policies for the home expressly addressed the possibility that another person could have an insurable interest in the home in addition to the insured’s interest protected under the policy. This contractual provision thus recognized the interests of multiple parties and the possibility of separate insurance policies insuring the same property. In such a setting, the plaintiffs’ policy provisions properly employ the concept of insurable interest as required in our insurance law to resolve the question of the benefits payable under the policies. As each plaintiff received benefits under her policy and cites no legal basis for a refund of premiums, we find no merit in them claims for such refunds.
| nSince both plaintiffs have separate policies insuring the home, the trial court’s dismissal of each plaintiffs claims requires our review. Lutey was paid the entire policy limit of $242,000 for the loss of the home. She makes no claim that USAA’s payment was untimely.
Both plaintiffs assert that the home was underinsured. This claim would have most significance for Lutey who, as owner of the home, was paid her policy limit.
The plaintiffs submitted in them opposition to USAA’s motion for summary judgment the affidavit of Harvey Hales. Hales stated that when the house was rebuilt, Barham insured it again with USAA for $303,000, as opposed to the $242,000 on the original policies. He stated that the coverage per foot for the new policy is $132 per square foot, and the coverage per foot on the old structure was $108. “Based on that information alone,” he concluded the original structure is underinsured. However, the actual cost of rebuilding the home was $243,083.87, and the record indicates that *1173 the new home was roughly the same square footage as the destroyed house.
Barham and Lutey each obtained their insurance policies over the phone. In those phone calls, they detailed to USAA the home’s characteristics from which the policy limit is determined. The record contains a page for each party detailing the “Home Characteristics” upon which the policy limit was based. Lutey, in her post-fire interview, was questioned regarding the $242,000 policy limit. The interviewer asked, “[W]hen they recommended the $242,000 ..., did you tell them ... that that |12wasn’t enough?” Lutey replied, “No, I did not[.] [I] didn’t know about it until (inaudible) the policy came and actually I’m ... at fault for not reading it more carefully.” The page titled, “Your Home Characteristics,” states that USAA helps the customer by determining whether the structure is “adequately covered in the event of a loss.” USAA calculates the “minimum rebuilding cost of your home based on your home characteristics, but only you can decide if this is enough coverage.” Both Barham and Lutey in their interviews stated they accepted the correctness of the policy limits.
From this review, we find no merit in Lutey’s claim that the home was underin-sured resulting in damages to her interests. Plaintiffs’ expert’s conclusion that the home should have been insured for $290,000 was not explained in terms of any value lost after the $243,000 rebuild. Both plaintiffs agree that despite Lutey’s ownership of the home, her interest under the family arrangement was similar to a home lender and intended to be temporary. Lu-tey did not dispute Barham’s approximately $15,000 equity interest in the home resulting from her sizable down payment and expenditures for home improvements. Thus, while the cost of rebuilding a similar structure slightly exceeded Lutey’s policy coverage limit, she shared “ownership” in a broader sense under the family arrangement. The payments for the fire loss to the home to both plaintiffs exceeded the cost of rebuilding. Finally, the insurance policy placed the risk of underinsurance upon the policy owner.
113Accordingly, we find no error in the trial court’s dismissal of Lutey’s claims under her policy with USAA. She brought forth no evidence in opposition to the motion for summary judgment to demonstrate why additional payment under the policy may be owed to her.
Turning to Barham’s claim, she contends that she was entitled to the $242,000 limit under her policy, plus an additional 25% under the added Home Protector Coverage provision. USAA paid her only $14,928.99 for her contribution to the price of the home and the costs of her improvements to the structure. Barham makes no assertions regarding USAA’s payment of policy benefits for the loss of her contents in the home.
In making her arguments, it is notable that Barham never takes the position that her mother lacked a substantial insurable interest in the home or was overpaid by USAA for the value of that insurable interest under the Lutey policy. Barham’s contentions emphasize that she lived in the home and her mother “had simply signed off on the paperwork involving the sale as a means of assisting her daughter” as a mere lender. Nevertheless, Barham does not dispute that the economic value of her mother’s assistance amounted by far to be most of the recent purchase price of the home. Barham correctly cites the jurisprudence for the recognition that a person does not have to have an ownership interest in the property to have an insurable interest, but that person must have a “lawful and substantial economic interest in the safety or preservation of the subject of the *1174 insurance free from loss, destruction, or pecuniary damage.” La. R.S. 22:853(B).
114The undisputed fact of Lutey’s pecuniary damage is seen by her payment of most of the purchase price secured by the title of the home standing in her name. With no facts disputing Lutey’s most significant insurable interest, Barham’s smaller insurable interest amounted to the money she also invested in the home. We find that the only evidence of Barham’s equity investment in the home was the $14,928.99, which USAA paid her.
In her brief, Barham takes the all-or-nothing approach in seeking the payment of the policy limit. She makes no argument that her $1,200 per month payments of rent to her mother added to her equity position in the home. Indeed, the evidence suggests that all or part of those monthly payments served as an interest return to her mother for Barham’s use of Lutey’s financial assets for the home’s purchase.
Finally, we find no merit in Barham’s Home Protector Coverage claim. Our review of that policy provision reveals that it would not be operative unless the policy limit for a home loss was reached.

Conclusion

Because Barham and Lutey failed to present to the court any genuine issues of material fact concerning their insurable interests in the lost home, they failed to meet their burden of overcoming USAA’s motion for summary judgment. Costs of the appeal are assessed to appellants.
AFFIRMED.

. This "interest” perhaps refers to roughly $800 monthly interest on the loan Lutey obtained from her brokerage account of which Barham told the claims adjuster in the interview.